## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CODY CASTO** | **CIVIL ACTION** |
| **VERSUS** | **NO:  15-817** |
| **DEPUTY DONALD PLAISANCE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A ST. TAMMANY PARISH DEPUTY SHERIFF, ET AL.** | **SECTION: "S" (5)** |

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that the St. Tammany Parish Sheriff's Office Defendants' Motion for Summary Judgment (Doc. #43) is **GRANTED** as to and plaintiff's excessive force claims against Deputy Donald Plaisance, in his individual capacity, regarding the un-holstering and brandishing of his weapon and use of the arm-bar technique, and those claims are **DISMISSED WITH PREJUDICE**.   The motion is **DENIED** as to plaintiff's excessive force claim against Deputy Donald Plaisance, in his individual capacity, regarding the tasing.[1]

**IT IS FURTHER ORDERED** that the motion is **DENIED** as to plaintiff's excessive force claim against Deputy Grey Thurman, in his individual capacity, regarding the use of the arm-bar technique.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** as to plaintiff's official capacity constitutional claims against Deputy Donald Plaisance, Corporal Von Vargo, Corporal

---

[1] Defendant, Travelers Indemnity Company, is the liability insurer for the St. Tammany Parish Sheriff's Office and Sheriff Strain. It moved to adopt the St. Tammany Parish Sheriff's Office defendants' motion for summary judgment (Doc. #45), and this court granted the motion (Doc. #46), because Travelers's liability depends on the findings of liability against the St. Tammany Parish Sheriff's Office defendants. Thus, the rulings herein apply to plaintiff's claims against Travelers.

Pamela Bailey, Deputy Ben Sedowski, Deputy Christopher Booth and Deputy Grey Thurman, and those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** as to plaintiff's constitutional claims and claim for negligent failure to prevent a conspiracy against Sheriff Rodney J. "Jack" Strain, Jr., in his individual and official capacities, and those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** the motion is **GRANTED** as to plaintiff's conspiracy claims against all defendants, and those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion is **DENIED** as to plaintiff's Louisiana state-law claims against all defendants.

## BACKGROUND

This matter is before the court on a motion for summary judgment filed by defendants, Sheriff Rodney J. "Jack" Strain, Jr., Dy. Donald Plaisance, Cpl. Von N. Vargo, Jr., Cpl. Pamela Bailey, Dy. First Class Ben Sedowski, Dy. Christopher Booth and Dy. Grey Thurman.  Dy. Plaisance and Dy. Thurman argue that they are entitled to qualified immunity on the plaintiff's excessive force claims.  Strain argues that he is entitled to summary judgment on plaintiff's constitutional claims.  All defendants argue that they are entitled to summary judgment on plaintiff's conspiracy claims, and that the court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's state-law claims.

Plaintiff, Cody Casto, is a police officer on disability leave from the New Orleans Police Department due to a leg injury that he sustained in the line of duty.  On March 16, 2014, Casto lived

with his fianceé, Alexis Wildey, in Covington, Louisiana.  On that date, the couple argued while eating dinner.  Casto threw a plate of food across the room and broke a glass-topped coffee table.  Casto told Wildey that he was going to go to his cattle ranch in Magnolia, Mississippi, and referred to the dinner as his "last supper."  Casto left and headed for Mississippi.

Wildey also left the residence and went to see Casto's twin brother, Cory Casto, at Kay Loup's residence to tell him about what had happened.  Around 11:00 p.m., Cory called 9-1-1 and spoke with Dy. Shelby Krantz, a dispatch officer with the St. Tammany Parish Sheriff's Office ("STPSO").  Cory told Krantz that he was worried about Casto and thought that Casto needed to be found and committed to a mental health treatment facility.  He also told Krantz that Casto had destroyed the inside of his and Wildey's home, was a police officer who was having emotional issues, had two firearms with him, and that Casto would not harm another officer.  Cory implied that he thought Casto was going to commit suicide, saying that he had a "horrible" feeling about the situation and was "scared to death" for Casto.  During the course of the next hour, STPSO personnel contacted at least five other law enforcement agencies to aid in the search for Casto.

Around 11:03 p.m., Dy. Booth and Cpl. Vargo were dispatched to Loup's residence.  They arrived around 11:14 p.m., and spoke with Wildey.  Wildey recounted the events of the evening and explained other factors that made her and Cory believe that Casto was suicidal, including that Casto was not answering their telephone calls and text messages.  While at Loup's residence, Dy. Booth contacted Casto by telephone.  Casto claims that, at Dy. Booth's request, he agreed to return home so that Dy. Booth  could "lay eyes on him," and that Dy. Booth stated that he would meet Casto in the driveway of the Casto/Wildey residence. Casto claims that, before heading home, he stowed his

firearms in a toolbox under the back passenger-side seat of his truck to ensure that the officers who met him would not be concerned for their safety.

At 11:08 p.m., Dy. Plaisance was dispatched to the Casto/Wildey residence.  While he was en route, the information from Cory's 9-1-1 call was typed into the STPSO CAD system and displayed on the screens in the STPSO deputies' patrol vehicles.  The same information was transmitted audibly over the STPSO radio network.  Thus, Dy. Plaisance was aware that Casto was a police officer, he had two firearms, and he left his residence threatening to kill himself.  Dy. Plaisance arrived at the Casto/Wildy residence at approximately 11:19 p.m., and observed that the garage door was open and the lights were on.  He did not see any vehicles in the driveway.  He approached the front door and could see through the glass that the interior of the residence was in disarray, with broken glass on the living room floor and food debris on the walls.  Dy. Plaisance contacted his supervisor, Cpl. Vargo, by radio. Cpl. Vargo advised Dy. Plaisance that Wildey gave verbal consent for the officers to search the residence.  However, Wildey now denies that she gave such permission, but claims that she did give the officers permission to close the garage door.

At approximately 11:32 p.m., Cpl. Bailey arrived at the Casto/Wildey residence.  Cpl. Bailey and Dy. Plaisance entered the residence.  They confirmed that it was unoccupied and took some photographs of the interior.  Then they turned out the lights and locked the doors before leaving.  Dy. Plaisance returned to normal patrol duties while continuing to be on the lookout for Casto's vehicle.

At approximately 11:42 p.m., Dy. Plaisance received information from the STPSO radio system that Casto had declared that if he sees the deputies "there will be a fight."  Casto denies that

4

he ever said this.  Instead, Casto says that he calmly talked with Dy. Krantz, did not threaten anyone, and told her that he was fine.

Around midnight, Dy. Plaisance received a radio call instructing him to stay in the general area of the Casto/Wildey residence because Casto might be returning home. At 12:09 a.m., Dy. Plaisance spotted Casto's vehicle and activated his lights.  Casto did not stop, so Dy. Plaisance followed him to the Casto/Wildey residence.  At 12:10 a.m., Dy. Plaisance parked perpendicularly to the Casto/Wildey residence's driveway blocking in Casto's vehicle.

Dy. Plaisance testified at his deposition that he drew his firearm and existed his patrol vehicle while simultaneously using his patrol vehicle's PA system to instruct Casto to exit his vehicle.  After twice instructing Casto to exit his vehicle, Dy. Plaisance saw Casto throw an object out of the driver-side window, which was later identified as Casto's walking cane.  Casto exited the vehicle after Dy. Plaisance instructed him to do so for the third time.  Dy. Plaisance testified that Casto screamed "my hands are up, mother f***er," but they were around Casto's waist and Casto was not holding anything.  Dy. Plaisance testified that he transitioned to his taser because he did not see a firearm in Casto's hands, but feared that Casto might have a firearm in his waistband.  Casto worked as an undercover police officer, and such officers typically carry firearms that are not visible.  Dy. Plaisance testified that Casto walked toward the front door, and when he realized that it was locked, he began walking toward Dy. Plaisance with clenched fists.  Dy. Plaisance ordered Casto to stop.  Casto did not stop.  Thus, Dy. Plaisance pointed his taser's red dot at Casto's check and deployed the taser.  One prong of the taser struck Casto in the belly and the other in his genital area.  Dy. Plaisance testified that Casto was standing at the time.  After Casto was tased, Dy. Plaisance's commanded Casto to get on the ground, but Casto said that he could not because of his

5

ankle injury.  Dy. Plaisance told Casto to get on his hands and knees instead, and Casto complied.

Casto asked to sit, which Dy. Plaisance allowed.  Dy. Plaisance waited for Dy. Thurman to arrive.

Thereafter, Dy. Plaisance handcuffed Casto, and removed himself from the situation, turning Casto

over to Dys. Thurman and Booth.

Casto offers a different version of the events. Casto testified that, while he was stopped at

a church on the way to his ranch, he spoke with Dy. Booth on the telephone, and Dy. Booth

instructed Casto to go home, where Dy. Booth would meet him.  Casto was headed home as

instructed by Dy. Booth.  Casto testified that he did not see the lights activated on Dy. Plaisance's

patrol vehicle until he was pulling into his driveway.  Casto testified he did not hear Dy. Plaisance

give him any orders, so the threw his walking cane out of the window for his and the officer's safety,

because it was dark and the officer might mistake it for a shotgun.  Then Casto exited the vehicle

and walked to the front door to put his bag down.  He heard Dy. Plaisance shout "get on the ground

mother f***er, get on the ground."  Casto turned around and there was a "pistol in [his] face" at a

distance of about three feet.  Casto testified that he asked what was going on, and he informed the

officer that he did not do anything wrong.  Casto put his hands up and told the officer that he had

an injured leg and could not get on the ground.  Casto tried to get on the ground, was in a leap frog

position and asked if he could sit on the porch because his leg was hurting.  The officer did not

respond, so he "went to kind of a push up to sit on the porch because it was right there, and that's

when [Dy. Plaisance] tased him."  One prong hit him in the abdomen, and the other in the genital

area. Casto testified that Dy. Thurman arrived, handcuffed him and "picked [him] up by [the] arms

and [the deputy] stretched his arms all the way up."  Casto requested emergency medical service to

6

remove the taser prong from his genitals, but one of the officers did it. Cpl. Vargo transported Casto to St. Tammany Parish Hospital in Dy. Plaisance's police vehicle.

Casto testified that he described the events to Cpl. Vargo, and Cpl. Vargo told him to get a lawyer and call the STPSO Internal Affairs Division, but that Cpl. Vargo would deny that he ever said this to Casto. Casto claims that, a few days later, he asked Cpl. Vargo if he could speak to Dy. Plaisance, but Dy. Plaisance's supervisor denied permission. Casto claims that he tried to contact the STPSO Internal Affairs Division to make a complaint, but has been given the "run around."

On March 13, 2015, Casto filed the instant complaint in the United States District Court for the Eastern District of Louisiana alleging claims arising out of the incident against Sheriff Strain, Dy. Plaisance, Cpl. Vargo, Cpl. Bailey, Dy. Sedowski, Dy. Booth and Dy. Thurman, in their individual and official capacities. Specifically, Casto alleges that the defendants are liable to him under 28 U.S.C. § 1983 for violating his rights guaranteed by the Fourth Amendment to the Constitution of the United States to be free from unlawful detention by the use of excessive force. Casto alleges that Dy. Plaisance used excessive force by un-holstering his firearm, brandishing his firearm and using his taser on Casto. Casto also alleges that Dy. Plaisance and Dy. Thurman used excessive force by using an arm-bar on him. Casto alleges that Sheriff Strain did not maintain adequate training policies regarding the deputies' use of a taser or their interactions with mentally ill or suicidal individuals. Casto also alleges that the defendants conspired to cover-up Dy. Plaisance's allegedly wrongful conduct. Further, Casto alleges claims under Louisiana state-law for negligence, battery, intentional and negligent infliction of emotional distress and false imprisonment.

# ANALYSIS

## I.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2509-10 (1986).  The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 106 S.Ct. at 2510).  In ruling on a motion for summary judgment, the court must adhere to the axiom that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Tolan v. Cotton, 134 S.Ct. 1861, 1863 (2014) (quoting Anderson, 106 S.Ct. at 2513).

## II.  Casto's § 1983 Individual Capacity Claims Against Dy. Plaisance and Dy. Thurman

Casto alleges that Dys. Plaisance and Thurman are liable under § 1983 for violating his rights secured by the Fourth Amendment to the Constitution of the United States to be free from unlawful detention by the use of excessive force.

### A. Section 1983

Section 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States. 42 U.S.C.

8

§ 1983; <u>Monell v. Dep't of Soc. Servs.</u>, 98 S.Ct. 2018 (1978).  Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. <u>Olabisiomotosho v. City of Hous.</u>, 185 F.3d 521, 525 n. 3 (5th Cir. 1999).

To pursue a claim under section 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States, and; (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. <u>Sw. Bell Tel., LP v. City of Hous.</u>, 529 F.3d 257, 260 (5th Cir. 2008); <u>see</u> <u>also</u> <u>West v. Atkins</u>, 108 S.Ct. 2250, 2255-54 (1988).

Casto alleges that Dys. Plaisance and Thurman violated his rights guaranteed by the Fourth Amendment to the Constitution of the United States to be free from unlawful seizure by the use of excessive force. The Fourth Amendment, made applicable to the States via the Fourteenth Amendment, "ensures that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." <u>Club Retro, L.L.C. v. Hilton</u>, 568 F.3d 181, 195 (5th Cir. 2009). An excessive force claim arising "in the context of an arrest or investigatory stop of a free citizen . . . is most properly characterized as one invoking the protections of the Fourth Amendment. . .". <u>Graham v. Connor</u>, 109 S.Ct. 1865, 1871 (1989).

Casto alleges that Dys. Plaisance and Thurman were acting under the color of law and pursuant to their authority as sheriff's deputies when they unlawfully detained him by the use of excessive force.  Therefore, Casto has alleged claims against Dys. Plaisance and Thurman under § 1983.  However,  Dy. Plaisance and Dy. Thurman argue that they did not violate Casto's Fourth Amendment rights to be free from unlawful detention by the use of excessive force because they are entitled to qualified immunity.

### B.  Qualified Immunity

Qualified immunity is an affirmative defense that protects public officials who are sued in their individual capacities for violations of constitutional rights.  Government officials are entitled to qualified immunity to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982).  "A qualified immunity defense serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." Atteberry v. Nocona Gen'l Hosp., 430 F.3d 245, 253 (5th Cir. 2005) (citation omitted).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 106 S.Ct. 1092, 1096 (1986). "The immunity inquiry is intended to reflect the understanding that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" Pasco v. Knoblauch, 566 F.3d 572, 582 (5th Cir. 2009) (citation omitted).

"To establish an entitlement to qualified immunity, a government official must first show that the conduct occurred while he was acting in his official capacity and within the scope of his discretionary authority." Beltran v. City of El Paso, 367 F.3d 299, 303 (5th Cir. 2004) (citing Cronen v. Tex. Dep't of Human Servs., 977 F.2d 934, 939 (5th Cir. 1992)). When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. Kitchen v. Dall. Cty., Tex., 759 F.3d 468, 476 (5th Cir. 2014).

A two-pronged inquiry is used to resolve qualified immunity questions raised on summary judgment. Tolan, 134 S.Ct. at 1865.  The first question is "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal]

right[.]'" Id. (quoting Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001)).  The question "asks whether the right in question was 'clearly established' at the time of the violation." Id. at 1866 (citing Hope v. Pelzer, 122 S.Ct. 2508, 2515 (2002)).  "Governmental actors are 'shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. (quoting Hope, 122 S.Ct. at 2515). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope, 122 S.Ct. at 2515. (quotations omitted).

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 129 S.Ct. 808, 818 (2009).  However, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." Tolan, 134 S.Ct. at 1866.  When there is a genuine dispute as to the material and operative facts regarding qualified immunity, "[s]ummary judgment is inappropriate unless plaintiff's version of the violations does not implicate clearly established law." Goodson v. City of Corpus Christi, 202 F.3d 730, 739 (5th Cir. 2000) (quoting Johnston v. City of Hous., Tex., 14 F.3d 1056, 1061 (5th Cir. 1994)).

### 1.  Unlawful Detention by Use of Excessive Force

A plaintiff claiming he was unlawfully detained by the use of excessive force in violation of the Fourth Amendment must first show that he was seized. Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004).  Next, he must demonstrate that he "suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." Id. (Goodson, 202 F.3d at 740).

### a. Seizure

"An officer seizes a person when he, 'by mans of physical force *or* show of authority, has in some way restrained the liberty of a citizen.'" Id. (quoting Terry v. Ohio, 88 S.Ct. 1868, 1879 n. 16 (1968)).  A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Michigan v. Chesternut, 108 S.Ct. 1975, 1979 (1988) (quotation omitted).

Dys. Plaisance and Thurman do not dispute that Casto was seized within the meaning of the Fourth Amendment.  Dy. Plaisance blocked Casto's vehicle in the driveway, pointed a firearm at Casto, and tased and handcuffed him.  Dy. Thurman allegedly used an arm-bar technique on Casto when he was in handcuffs.  Indeed, Dys. Plaisance and Thurman argue that they are entitled to qualified immunity for their seizure of Casto.[2]  Thus, Casto has satisfied the seizure element.

### b. Injury Resulting from the Use of Force

Casto alleges four discrete actions that he claims individually amounted to the use of excessive force.   Specifically, Casto alleges that Dy. Plaisance used excessive force by un-holstering his weapon, brandishing his weapon and tasing him.  Casto also alleges Dy. Thurman used excessive force by using an arm-bar technique on him.[3]

---

[2]  In the motion for summary judgment, Dys. Plaisance and Thurman argue that they are entitled to qualified immunity regarding the seizure of Casto under the standard set forth in Terry v. Ohio, 88 S.Ct. 1868 (1968), which is used to determine the constitutional validity of a seizure that stops short of an arrest.  Casto's claims are more properly analyzed under Graham v. Connor, 109 S.Ct. 1865 (1989), because he alleges that he was unlawfully detained by the use of excessive force.

[3]  In the complaint, Casto alleges that both Dys. Plaisance and Thurman used the arm-bar technique on him.  However, at his deposition and in his declaration, Casto testified that it was Dy. Thurman that used the arm-bar technique on him.  Further, Dy. Plaisance testified that, after he handcuffed Casto, he removed himself from the situation, leaving Casto with Dys. Thurman and Booth.  Therefore, Dy. Plaisance is entitled to summary judgment on Casto's excessive force claim regarding the use of the arm-bar technique, and that claim is DISMISSED WITH PREJUDICE.

As to Dy. Plaisance's un-holstering and brandishing his weapon, Casto alleges that he "fear[ed] imminent bodily harm" and stated in his affidavit that he was "very afraid that [he] was going to get shot."  At his deposition, Casto testified that "it aggravates [him] that a gun was pulled on [him] in the first place[,]" and he is "pretty upset about that."  Psychological injury may sustain a Fourth Amendment claim, but the injury must be more than *de minimus*. Flores, 381 F.3d at 398; Brooks v. City of West Point, Miss, - - - Fed. Appx. - - -, 2016 WL 556360, at *3 (5th Cir. 2016). Casto described momentary fear during the incident.  He has not presented any evidence that he suffered a more substantial psychological injury with respect to these two events.   Because Casto has not shown more than a *de minimus* injury with respect to Dy. Plaisance's un-holstering and brandishing his weapon, Dy. Plaisance's motion for summary judgment is GRANTED as to those two claims, which are DISMISSED WITH PREJUDICE.

Casto presented evidence of injuries that are more than *de minimus* with respect to Dy. Plaisance's tasing him and Dy. Thurman's using an arm-bar technique on him.   In his affidavit, Casto states that "as a result of the tasing" he has suffered from extreme emotional distress and anxiety, including symptoms of depression, crying episodes, increased sleep, feeling punished, decreased libido, and loss of energy, enjoyment of life, confidence and appetite. He also testified at his deposition that he suffers from erectile dysfunction.  In his affidavit, Casto declares that the taser barb lodged in his genitals and that it moved when Dy. Thurman used the arm-bar technique, which caused him great pain.  Because Casto has demonstrated he suffered more than *de minimus*

injuries resulting from the tasing and use of the arm-bar technique, the remaining question is whether these uses of force were "objectively reasonable."[4]

### c. Objective Reasonableness

Evaluating the reasonableness of an officer's use of force "requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion." Tolan, 134 S.Ct. at 1865. (quotation omitted).   In excessive force cases, the objective reasonableness inquiry "amounts to 'whether the totality of the circumstances justifies a particular sort of seizure.'" Autin v. City of Baytown, Tex., 174 Fed. Appx. 183, 185 (5th Cir. 2005)  (quoting Tennessee v. Garner, 105 S.Ct. 1694, 1700 (1985)).  "Reasonableness in these circumstances 'must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.'" Hathaway v. Bazany, 507 F.3d 312, 320-21 (5th Cir. 2007) (quoting Graham, 109 S.Ct. at 1872). It is a question "of 'objective reasonableness,' not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight." Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009) (quoting Ontiveros v. City of Rosenberg, Tex., 564

---

[4] Dy. Plaisance's actions are the focus of the motion for summary judgment.  On page 16, defendants state that "the use of the Taser was the only [use of force] from which plaintiff's claims of physical injury are based."  There is a footnote that states that Dr. Charles Kelly, plaintiff's proffered expert in police policy, "conceded that the defendants' use of force *after* the tasing, was appropriate, given plaintiff's admitted verbal threatening of Dy. Plaisance."  In the deposition testimony cited to support this statement, Dr. Kelly testified that it would be appropriate for the defendants to handcuff Casto if he was threatening Dy. Plaisance.  There is no mention of using the arm-bar technique.  The court cannot analyze the objective reasonableness of Dy. Thurman's alleged use of the arm-bar technique because there is insufficient argument and evidence presented to do so.  Thus, the motion for summary judgment is DENIED as to Casto's excessive force claim against Dy. Thurman, in his individual capacity, regarding the use of the arm-bar technique.

F.3d 379, 382-83 (5th Cir. 2009)).  "The excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of force]." Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir. 2011) (quoting Bazan v. Hidalgo Cnty., 246 F.3d 481, 493 (5th Cir. 2001)) (emphasis in original).  Excessive force claims depend on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 109 S.Ct. at 1872.  Not all of the foregoing Graham factors need "be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others." Rockwell, 664 F.3d at 992.

Dy. Plaisance argues that the facts within his knowledge when he tased Casto demonstrate that the force used was objectively reasonable.  Dy. Plaisance's deposition testimony establishes that, when he first encountered Casto in the driveway, Dy. Plaisance had previously observed that the interior of the Casto/Wildey residence was in disarray with broken glass on the floor, home decor thrown around and food debris on the walls.  Dy. Plaisance had received information from the STPSO radio communication that Casto was a police officer, had two firearms with him, threatened suicide and had declared that if he saw the deputies there would be a fight.  Further, Dy. Plaisance thought that Casto was avoiding him because Casto failed to stop when Dy. Plaisance activated his patrol vehicle's lights.  Dy. Plaisance testified that the cumulation of this information caused him to conclude that Casto was not thinking rationally.  As a result, Dy. Plaisance drew his firearm for his own safety when he existed his vehicle, because he was alone on the scene.

Dy. Plaisance testified that Casto did not comply with his commands to exit the vehicle. When Casto exited the vehicle and Dy. Plaisance realized that Casto was not holding a firearm, he

transitioned to his taser because he feared that Casto could have hidden firearms on him. According to Dy. Plaisance he "was de-escalating, trying to get [Casto] to comply with [the] commands," which were to get on the ground. Dy. Plaisance testified that Casto was agitated, screaming at him, and refusing to comply with his commands. Dy. Plaisance testified that he used the taser because he and Casto are both big men, and Dy. Plaisance did not want to "go hands-on with [Casto]" and hurt him.

Casto's deposition testimony provides a different version of the events, which he contends demonstrates that the use of force was objectively unreasonable because Dy. Plaisance knew that he posed no threat. Casto testified that he was compliant with all of Dy. Plaisance's orders to the best of his ability considering his leg injury. Casto testified that Dy. Plaisance did not give him any orders regarding exiting the vehicle. The first order Casto heard was Dy. Plaisance shouting at him to "get on the ground" while Dy. Plaisance pointed a firearm at Casto from about three feet away. Casto testified that he informed Dy. Plaisance that he did not do anything wrong, put his hands up and told the officer that he had an injured leg and could not get on the ground. Casto testified that he tried to get on the ground, was in a leap frog position and asked if he could sit on the porch because his leg was hurting. When Dy. Plaisance did not respond, Casto attempted to sit on the porch, and Dy. Plaisance tased him. Casto testified that he was not standing when the tasing occurred. Further, Casto argues that the use of force was objectively unreasonable because Dy. Plaisance knew that he did not commit a crime, and he was not resisting arrest or attempting to flee.

Dy. Plaisance and Casto have submitted evidence that supports completely different versions of what transpired. Dy. Plaisance testified that all of his actions were taken because he feared for his safety in the circumstances considering Casto's law enforcement background, the possibility that Casto had a firearm, and Casto's noncompliance with his orders. However, Casto testified that Dy.

16

Plaisance did not give him any orders until after Casto walked to the porch and Dy. Plaisance had a firearm pointed at him. Casto also testified that he tried to explain to Dy. Plaisance that he could not get on the ground because of his leg injury. Casto's testimony calls into question what information Dy. Plaisance possessed to assess the alleged treatment prior to the tasing, and if Casto's version is correct, a jury could find that Dy. Plaisance's use of the taser was not objectively reasonable. See Lytel v. Bexar CTY., Tex., 560 F.3d 404, 412 & 417 (5th Cir. 2009). Thus, Dy. Plaisance is not entitled to summary judgment on Casto's excessive force claim regarding the tasing unless the constitutional right allegedly infringed upon was not clearly established at the time of the incident. Id. at 417.

### b. Clearly Established Right

The "central concept" in the clearly established right inquiry is "fair warning." Id. at 417. "'The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" Id. (quoting Kinny v. Weaver, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)). "'Thus, while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene.'" Id. (quoting Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008)). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987).

The plaintiff in Newman v. Guedry, 703 F.3d 757, 764 (5th Cir. 2012), was tased by an officer. In analyzing the "clearly established right" prong of the qualified immunity inquiry, the

17

United States Court of Appeals for the Fifth Circuit applied the <u>Graham</u> excessive-force factors.  <u>Id.</u> The court held that, taking the facts in the light most favorable to the plaintiff, the officers' conduct was objectively unreasonable because the plaintiff "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command." <u>Id.</u>

In this case, if the facts are taken in the light most favorable to Casto, a reasonable officer would have understood that he could not tase Casto.  Casto did not commit any crime.  Casto contends that he did not pose a treat to Dy. Plaisance's safety and he was not resisting Dy. Plaisance's commands.  Dy. Plaisance admitted in his deposition that the tasing was unreasonable if Casto's version of the events is correct.  Therefore, Casto's constitutional right was clearly established, and Dy. Plaisance's motion for summary judgment as to Casto's excessive force claim regarding the tasing is DENIED.

## III.    Casto's Official Capacity Claims

A claim against a police officer in his official capacity is treated as a claim against the municipality that the officer serves. <u>Brooks v. George CTY., Miss.</u>, 84 F.3d 157, 165 (5th Cir. 1996). In <u>Monell</u>, 98 S.Ct. at 2037, the Supreme Court of the United States held that local governments cannot be held liable under § 1983 for constitutional deprivations effected by their individual employees in their official capacities absent a showing that the pattern of behavior allegedly arose from "the execution of a government's policy or custom." To succeed on a <u>Monell</u> claim, the plaintiff must establish: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. <u>Valle v. City of Hous.</u>, 613 F.3d 536, 541-42 (5th Cir. 2010).

The "policymaker" prong is satisfied if actual or constructive knowledge of a policy is attributable to the municipality's governing body or to an official to whom the municipality has delegated policy making authority. Webster v. City of Hous., 735 F.2d 838, 842 (5th Cir. 1984) (*en banc*).  Under Louisiana law, the sheriff is the final policymaker for a parish's law enforcement.  See La. Const. art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish.").  Sheriff Strain is the policymaker for the STPSO.[5]

The "official policy" prong requires that the deprivation of constitutional rights be inflicted pursuant to an official custom or policy. "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." Piotrowski v. City of Hous., 237 F.3d 567, 579 (5th Cir. 2001).  However, a policy may also be a custom that is ". . . a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy . . ." Id. (quoting Webster, 735 F.2d at 841).  The failure to train or inadequate training of officers can be an official policy that subjects the municipality to liability under § 1983, "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." City of Canton, Ohio v. Harris, 109 S.Ct. 1197, 1204 (1989).

To prevail on a Monell claim arising from the failure to adopt an adequate training policy, a plaintiff must show that: (1) the municipality's training policy procedures were inadequate, (2) the municipality was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation. Kitchen, 759 F.3d at 484 (5th Cir. 2014)

---

[5] Casto brought official capacity claims against Dy. Plaisance, Cpl. Vargo, Cpl. Bailey, Dy. Sedowski, Dy. Booth, and Dy. Thurman.  These claims are DISMISSED WITH PREJUDICE because they are not policymakers for the STPSO.

(quoting Sanders-Burns v. City of Plano, 594 F.3d 366, 381 (5th Cir. 2010)).  The jurisprudence establishes two methods for a plaintiff to establish a municipality's deliberate indifference to the need for proper training. Id.  The first "is to demonstrate that a municipality had '[n]otice of a pattern of similar violations,' which were 'fairly similar to what ultimately transpired' when the plaintiff's own constitutional rights were violated." Id. (quoting Sanders-Burns, 594 F.3d at 381).  The second method is the "single incident exception." Id.  "The 'single incident exception' is narrow and to rely on the exception 'a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation.'" Sanders-Burns, 594 F.3d at 381 (quoting Davis v. City of N. Richland Hills, 406 F.3d 375, 386 (5th Cir. 2005)).  The "single incident exception" applies when there is a complete failure to train, not just a failure to train in one limited area. See Davis, 406 F.3d at 386.

Casto contends that the moving force behind the alleged constitutional violation is the STPSO's lack of a policy for handling situations involving mentally ill or suicidal individuals.[6] Casto points out that Sheriff Strain testified at his deposition that he was aware of the high suicide rate in St. Tammany Parish, but that the STPSO does not have a specific policy contained in its manual for dealing with mentally ill or suicidal individuals.

---

[6] In the complaint, Casto alleges that the STPSO had an inadequate training policy regarding the use of tasers.  In the opposition to the motion for summary judgment, Casto focuses on the STPSO's allegedly inadequate training policy regarding the deputies' interactions with mentally ill or suicidal individuals. Further, Dy. Plaisance testified at his deposition that he has taken the taser certification course twice.  Because Casto did not oppose the motion on the ground that the STPSO had an inadequate training policy regarding the use of tasers, that claim is deemed abandoned and is DISMISSED WITH PREJUDICE. See Essinger v. Liberty Mut. Fire Ins. Co., 529 F.3d 264, 271 (5th Cir. 2008) (finding that plaintiffs abandoned a claim when their response to defendant's motion for summary judgment was limited to another claim).

As to the first approach of proving deliberate indifference, Casto has not put forth evidence to demonstrate a pattern of violations similar to what transpired in this case. Casto argues that a finding by the United States Justice Department regarding the failure of the St. Tammany Parish Jail, which is under Sheriff Strain's control, to provide adequate mental health care and suicide prevention for inmates demonstrates deliberate indifference by Sheriff Strain to the needs of mentally ill or suicidal individuals. However, this finding was specific to the jail. It did not address the interactions of deputies on patrol with citizens who may be mentally ill or threatening suicide. Casto offers no evidence showing a pattern of constitutional violations similar to the one he alleges that he suffered that were caused by deputies out on patrol who were interacting with mentally ill or suicidal individuals.

Further, Casto has not established that the narrow "single incident exception" applies. Casto alleges that the STPSO's training policies are deficient in the particular area of dealing with mentally ill or suicidal individuals, not that there is a complete failure to train. At his deposition, Sheriff Strain identified and discussed the STPSO's policy manual, which a voluminous document. He explained that the document evolved over his twenty-year tenure as sheriff with input from officers at all ranks of the STPSO, and that it attempts to incorporate the best and most up-to-date practices and policies on a wide range of topics. All STPSO personnel have access to the document and must acknowledge receipt. Sheriff Strain acknowledged that there is no specific policy dealing with situations involving mentally ill or suicidal individuals, but continued that he did not know that it would be possible to create such a policy because each situation is different. Sheriff Strain also testified that the STPSO deputies are "highly trained and very skilled in the best practices that training can offer them today to deal with those things[,]" and that the STPSO  "probably do[es]

21

more training with [its] deputies to be prepared to deal with mental patients in some capacity and probably as good as or better than most jurisdictions."

Dy. Plaisance testified that he could not recall receiving any training from STPSO regarding the handling of mentally ill individuals.  Lt. Hanson, who is Dy. Plaisance's supervisor, testified at his deposition that he was not trained in crisis intervention and he did not think that Dy. Plaisance was either.  However, dealing with mentally ill or suicidal people is one specific training area, not a complete failure to train.  Indeed, Dr. Charles Kelly, Casto's proffered expert in the field of police policy, testified at his deposition that the STPSO training program is "exemplary," that the STPSO is "recognized statewide as such, as a highly qualified, highly trained law enforcement agency," and that the STPSO's policies and procedures are very good.  Therefore, the "single incident exception" does not apply.  Sheriff Strain's motion for summary judgment as to Casto's claim against him in his official capacity is GRANTED, and that claim is DISMISSED WITH PREJUDICE.

## IV.   Casto's § 1983 Individual Capacity Claims Against Strain

Casto names Sheriff Strain as a defendant in his individual capacity, but makes no allegations that Strain was personally involved in the incident that is the subject of this suit. "Plaintiffs suing governmental officials in their individual capacities . . . must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to the constitutional claims." Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002) (citation omitted).  Additionally, "[p]ersonal involvement is an essential element of a civil rights cause of action." Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983). Moreover, a sheriff cannot be held vicariously liable for the actions of his deputies pursuant to § 1983. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir.1987); see also Oliver, 276 F.3d at 742 ("Section

1983 does not create supervisory or respondeat superior liability.").  Because Casto does not allege that Sheriff Strain was present at or personally involved in the incident that is the subject of this suit, Sheriff Strain is entitled to summary judgment on Casto's § 1983 claims against him in his individual capacity.  Thus, Sheriff Strain's motion for summary judgment on Casto's § 1983 claims against him in his individual capacity is GRANTED, and those claims are DISMISSED WITH PREJUDICE.

## VI.    Casto's Conspiracy Claims

Defendants argue that Casto has no evidence to support an alleged conspiracy to violate his civil rights.

A § 1983 conspiracy claim is a "legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act, but a conspiracy claim is not actionable without an actual violation of section 1983." Hale v. Townley, 45 F.3d 914, 920 (5th Cir. 1995).  A conspiracy claim under § 1983 requires an agreement to commit an illegal act, and an actual deprivation of constitutional rights in furtherance of that conspiracy. Priester v. Lowndes Cty., 354 F.3d 414, 420 (5th Cir. 2004); Hernandez v. Houston, 564 Fed. Appx. 81, 82 (5th Cir. 2014). "Allegations that are merely conclusory, without reference to specific facts, will not suffice." Id. (quoting Brinkmann v. Johnston, 793 F.2d 111, 113 (5th Cir. 1986)).  A plaintiff must "develop facts from which a trier of fact could reasonably conclude" that there was an agreement"to commit an illegal act and that a deprivation of constitutional rights occurred." Rodriguez v. Neeley, 169 F.3d 220, 222 (5th Cir. 1999); see also Bohannan v. Doe, 527 Fed. Appx. 283, 300 (5th Cir. 2013) ("A plaintiff must allege specific facts to show an agreement.").

In the complaint, Casto alleges that Dys. Plaisance, Booth, Thurman and Sedowski, along with Cpls. Vargo and Bailey, "conspired to cover up Deputy Plaisance's wrongful conduct[,] and to

"effectuate said conspiracy on March 16, and 17, 2014, Deputy Plaisance falsely charged that Mr. Casto was allegedly non-compliant with his commands." Casto also alleges that Sheriff Strain and his deputies had a policy of conspiring to cover-up "wrongful and criminal conduct by hiding behind assertions of non-compliance." Casto claims that these actions violated his rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

Casto argues that he has put forth evidence supporting his claim that the defendants conspired to cover-up Dy. Plaisance's use of force. Specifically, Casto points to his testimony that Cpl. Vargo told him to get an attorney and file an Internal Affairs complaint against Dy. Plaisance, and that Cpl. Vargo said that he would deny ever making this comment. Casto also testified that, when he asked Cpl. Vargo if he could speak with Dy. Plaisance, Cpl. Vargo told him that he could not because Ltn. Hanson denied permission. According to Casto, this is evidence that Cpl. Vargo, Dy. Plaisance and Ltn. Hanson conspired to "shun" him. Further, he argues that his inability to contact STPSO's Internal Affairs department, and the lack of an Internal Affairs report regarding the incident are all evidence of a cover-up.

Casto does not allege, and presents no evidence, that the defendants conspired with Dy. Plaisance or Dy. Thurman to violate Casto's constitutional rights by using excessive force with respect to the tasing or use of the arm-bar technique. Instead, he claims that the defendants conspired after-the-fact to cover-up Dy. Plaisance's actions. This conspiracy claim alleges a conspiracy to deny Casto access to the courts, because it is constitutional right of which Casto could be deprived in furtherance of the alleged conspiracy to conceal Dy. Plaisance's actions.

To prevail on a denial of access to the courts claim, a plaintiff must prove that the conspiracy "hindered his efforts to pursue a legal claim." Lewis v. Casey, 116 S.Ct. 2174, 2180 (1996). There

are two type of access to the courts claims, "forward-looking" and "backward-looking."  In a

"forward-looking" access claim, the defendants' actions are blocking a plaintiff's ability to litigate.

Christopher v. Harbury, 122 S.Ct. 2179, 2186 (2002).  "The object of [this type of] denial-of-access

suit, . . . is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating

condition has been removed." Id.  Casto cannot state this type of access to the courts claim because

he has filed this lawsuit seeking redress for Dy. Plaisance's alleged use of excessive force.

A "backward-looking" access-to-the-courts claim is about a litigation opportunity that was

lost becuase the claim cannot now be tried or tried with all material evidence, regardless of future

official actions. Id. To prevail on such a claim, a plaintiff must prove an underlying cause of action

the litigation of which was frustrated by official acts, that resulted in a lost remedy. Id. at 2186-87.

A lost remedy is one

> that may be awarded as recompense but not otherwise available in
> some suit that may yet be brought.  There is, after all, no point in
> spending time and money to establish the facts constituting denial of
> access when a plaintiff would end up just as well off after litigating
> a simpler case without the denial-of-access element.

Id. at 2187.  For example, a lost remedy could be "the loss or inadequate settlement of a meritorious

case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular relief."

Id. at 2186.

Casto has not alleged that there was a litigation that ended poorly or that he cannot now seek

some particular relief in litigation due to the alleged cover-up.  Casto claims that he was unable to

file an Internal Affairs complaint against Dy. Plaisance.  However, filing such a report is not

equivalent to accessing the courts.  Therefore, Casto has not shown that the defendants actually

deprived him of a constitutional right in furtherance of the alleged conspiracy to cover-up Dy.

Plaisance's alleged use of excessive force.  Defendants' motion for summary judgment is GRANTED as to Casto's conspiracy claims, and those claims are DISMISSED WITH PREJUDICE.[7]

## VII.    Casto's State Law Claims

Casto alleges Louisiana state-law claims of negligence, battery, intentional and negligent infliction of emotional distress and false imprisonment.  Defendants argue that the state-law claims should be dismissed for the same reasons as the constitutional claims or that the court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367, because all of Casto's constitutional claims, the ones that this court has original jurisdiction over pursuant to 28 U.S.C. § 1331, should be dismissed.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." Further, a district court may decline supplemental jurisdiction if the state law claim "substantially predominates over the claim or claims over which the district court has original jurisdiction. Id. at § 1367(c)(2); see also United Mine Workers of Am. v. Gibbs, 86 S.Ct. 1130, 1139 (1996) ("[I]f it appears that the state issues substantially predominate . . . the state claims may be dismissed without prejudice and left for resolution to state tribunals.").

This court has not dismissed all of the claims over which it has original jurisdiction. Specifically, Casto's excessive force claims against Dys. Plaisance and Thurman regarding the tasing and use of the arm-bar technique remain pending.  Therefore, the court retains supplemental

---

[7] Casto alleges that Sheriff Strain is liable under 42 U.S.C. § 1985 for negligently failing to prevent the alleged conspiracy.  Because the court finds that Casto cannot maintain the conspiracy claims, he cannot maintain the claim against Sheriff Strain for negligently failing to prevent the conspiracy, and that claim is DISMISSED WITH PREJUDICE.

jurisdiction under § 1367 over Casto's state law claims.  Defendants' motion for summary judgment is DENIED as to dismissing Casto's state-law claims.

## CONCLUSION

**IT IS HEREBY ORDERED** that the St. Tammany Parish Sheriff's Office Defendants' Motion for Summary Judgment (Doc. #43) is **GRANTED** as to and plaintiff's excessive force claims against Deputy Donald Plaisance, in his individual capacity, regarding the un-holstering and brandishing of his weapon and use of the arm-bar technique, and those claims are **DISMISSED WITH PREJUDICE**.   The motion is **DENIED** as to plaintiff's excessive force claim against Deputy Donald Plaisance, in his individual capacity, regarding the tasing.

**IT IS FURTHER ORDERED** that the motion is **DENIED** as to plaintiff's excessive force claim against Deputy Grey Thurman, in his individual capacity, regarding the use of the arm-bar technique.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** as to plaintiff's official capacity constitutional claims against Deputy Donald Plaisance, Corporal Von Vargo, Corporal Pamela Bailey, Deputy Ben Sedowski, Deputy Christopher Booth and Deputy Grey Thurman, and those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** as to plaintiff's constitutional claims and claim for negligent failure to prevent a conspiracy against Sheriff Rodney J. "Jack" Strain, Jr., in his individual and official capacities, and those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** the motion is **GRANTED** as to plaintiff's conspiracy claims against all defendants, and those claims are **DISMISSED WITH PREJUDICE**.

27

**IT IS FURTHER ORDERED** that the motion is **DENIED** as to plaintiff's Louisiana state-law claims against all defendants.


New Orleans, Louisiana, this   16th   day of May, 2016.


MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE

28